# CIRCUIT COURT OF THE CITY OF ROANOKE

Nationwide Mutual
Insurance Company

v.

Jimmy C. Gearhart, Jr., et al.

March 18, 2013

Case No. CL08-946

By Judge Clifford R. Weckstein

This declaratory judgment suit arises from the injury claim of David Kyle Umberger, III, who was a pedestrian on a sidewalk near a Roanoke hospital when he was struck and injured by an airborne four-by-eight foot sheet of plywood. Wind or other natural forces lifted the unsecured sheet of plywood from the cargo area of a pickup truck, propelling it into Umberger. The pickup truck's driver and his foreman, acting in the course of their employer's business, had loaded the plywood sheet into the pickup.

While Umberger's personal injury suit was pending, Nationwide Mutual Insurance Company ("Nationwide") filed this suit, seeking "adjudication of its obligations . . . and its responsibility . . . for any claims or causes of action arising . . . out of the incident described [in Umberger's Complaint]." The Cincinnati Insurance Company ("Cincinnati"), one of the defendants named by Nationwide, answered, counterclaimed, cross-claimed, and filed

a third-party complaint. Cincinnati, like Nationwide, asserted that it had no responsibility to defend against, or to pay, any claim in the Umberger suit.

"Cincinnati and Nationwide," according to their Amended Joint Stipulation of Facts, "agreed to litigate the insurance coverage issues this case presents following settlement of the Underlying Tort Action." The Umberger tort claim was settled, and those coverage questions are before this court on dueling motions for partial summary judgment.

Cincinnati had issued policies insuring the employer. The driver had an auto insurance policy issued by Nationwide Mutual Fire Insurance Company, and the pickup truck's owner had an auto insurance policy issued by Nationwide General Insurance Company. By stipulation, both of those companies are referred to as "Nationwide" and treated as a single entity.

### Partial Summary Judgment Is Appropriate

Virginia Code § 8.01-184 states, in relevant part, that, "[i]n cases of actual controversy, circuit courts within the scope of their respective jurisdictions shall have power to make binding adjudications of right, whether or not consequential relief is, or at the time could be, claimed." Each insurance company seeks summary judgment on the issue of liability, or legal responsibility. *See Fried v. Smith*, 244 Va. 355, 358, 421 S.E.2d 427, 439 (1992) (definition of liability).

Under Rule 3:20 of the Rules of the Supreme Court of Virginia:

> Summary judgment, interlocutory in nature, may be entered as to the undisputed portion of a contested claim or on the issue of liability alone although there is a genuine issue as to the amount of damages. Summary judgment shall not be entered if any material fact is genuinely in dispute.

Counsel for both companies have successfully worked to assure that there are no material facts in dispute and that the court has all of the information necessary to determine each company's legal responsibility. The court finds that partial summary judgment is appropriate.

### Background

The facts before the court are contained in an "Amended Joint Stipulation of Facts" and a "Joint Stipulation of Facts" entered into by Nationwide and Cincinnati. A number of documents are before the court as a result of those stipulations, including the transcript of deposition testimony of Jimmy C. Gearhart, Jr.; the transcript of the "summary judgment hearing" in which defendants Jimmy C. Gearhart, Jr., and Jennifer C. Shipp participated. (As that transcript shows, Nationwide and Cincinnati stipulated that, in ruling on the motions for summary judgment, the court could consider and rely on the information presented at that hearing. Gearhart, Shipp, and the

other *dramatis personae* are introduced below.); and responses to Requests for Admission propounded by Nationwide.

The Amended Joint Stipulation recites that Nationwide and Cincinnati "agreed to litigate the insurance coverage issues this case presents following settlement of the Underlying Tort Action." Either company, they agreed, could engage in mediation and could settle the Umberger case without waiving its rights in this coverage dispute.

In mediation, Cincinnati paid Umberger $375,000 in full settlement of his claim. The active stage of this litigation followed.

### The Participants

These are the key players and their roles.

Jennifer Shipp owned the parked pickup truck from which wind or other natural forces lifted the unsecured sheet of plywood that struck Umberger. She is a defendant in this declaratory judgment suit, but is not represented by counsel.

Jimmy C. Gearhart, Jr., drove the pickup truck to his worksite from the home that he and Shipp share. Later that day, Gearhart and Will Altizer loaded the sheet of plywood onto the pickup truck's bed. He, too, is a defendant in this case and, like Shipp, is not represented.

Gearhart and Altizer were employees of F&S Building & Remodeling Corporation ("F&S"). On the day Umberger was injured, Altizer was Gearhart's supervisor.

Shipp, Gearhart, and their children are members of the same household. Gearhart had Shipp's unrestricted permission to use the pickup truck.

Shipp and Gearhart each owned a vehicle insured by a Nationwide "Personal Auto Policy." For each occurrence, Shipp's policy provided liability coverage of up to $100,000 per claimant, with a $300,000 occurrence limit. Gearhart's policy had a liability limit of $50,000 per claimant with a $100,000 occurrence limit.

F&S was insured by Cincinnati under a "Virginia Business Auto Policy" with a $1 million per-occurrence policy limit and under a "commercial package policy" that included commercial general liability (CGL) coverage with a per-occurrence limit of $3 million, and an umbrella policy.

All of these insurance policies were issued in Virginia. The Shipp and Gearhart vehicles were garaged in Virginia.

### The Events

On the morning in question, Gearhart and Altizer, as F&S employees, were assigned to work on a job that they were finishing up at Carilion Roanoke Community Hospital. Gearhart drove the pickup truck from his home directly to the worksite, where he parked. He and Altizer met on the site at about 6:30 a.m. Altizer arrived in a dump truck, behind which he was

towing a trailer that carried a Bobcat, a piece of construction equipment. "Bobcat" is a brand name; Bobcat Company makes a number of different types of construction vehicles and equipment. The company's line of skid-steer loaders and similar pieces of equipment often are called "Bobcats." That is the label that will be used throughout this opinion.

Altizer and Gearhart, in the course of their employment as employees of F&S, proceeded to "clean up the job," throwing trash and debris from the site into the dump truck.

By approximately 11:00 a.m., the dump truck was full. The sheet of plywood that later struck Umberger was leaning against a hospital wall. This plywood sheet, Gearhart said, was "the last thing on the job." It belonged to F&S, and Gearhart and Altizer had used it on the Community Hospital job.

Gearhart and Altizer decided that they would drop the Bobcat off at F&S's shop, dump the trash and debris at the nearby trash transfer station, and then return to the worksite to load the sheet of plywood into the dump truck to take to the next jobsite.

Altizer, the supervisor, did not want to leave the plywood leaning against the wall, so he suggested that the two men put it in Gearhart's parked pickup truck until they returned to the worksite. Gearhart agreed, and the two F&S employees loaded the sheet of plywood into the pickup truck's cargo area. The board extended about ten inches beyond the end of the bed.

They did not have straps with which to secure the board, nor (Gearhart testified) did they see a need to secure it, as they planned to promptly return to the site and move the plywood into the dump truck.

They were away from the worksite for approximately thirty-five to forty minutes. When they returned, the plywood sheet was on the sidewalk, and blood was on the pavement nearby. Umberger had already been taken to the hospital. All parties are proceeding on the belief that wind or other natural forces lifted the unsecured plywood sheet from the pickup's bed, propelling it into Umberger.

### Party Contentions

Nationwide's position is simple and direct. The company says as follows. The Shipp and Gearhart policies obligate Nationwide "to pay damages for **bodily injury** or **property damage** for which any **insured** becomes legally responsible because of an auto accident. . . . We have no duty to defend any suit or settle any claim for **bodily injury** or **property damage** not covered under this policy."[1] Tr., Duty to Defend Hr'g, at 9 (bold-face in original policies). The incident that led to Umberger's injuries and lawsuit was not an "auto accident." Since there was no "auto accident," there is no

---

1. Under the policy, the term "insured" means (among other things) "any person using or responsible for the use of your covered auto." Responding to an argument made by Cincinnati, and to the court's bench ruling, Nationwide also asserts that the Shipp pickup truck was not being "used" as a pickup truck. That argument is addressed below.

coverage. Since there is no coverage, Nationwide owes neither a duty of payment nor a duty of defense.

Nationwide paid for Gearhart's defense, but did so under reservation of rights.

Cincinnati asserts that Nationwide owed a duty to defend both Gearhart and F&S under the Shipp policy and owes a duty to indemnify Gearhart and F&S under both the Shipp and Gearhart policies. Since the Shipp policy provided the primary coverage, Cincinnati says, Nationwide must reimburse Cincinnati for its costs and expenses in defending F&S.

Cincinnati suggests the manner in which to allocate the $375,000 settlement amount, plus other recoverable costs, among the various policies. Nationwide declined to participate in that discussion, because it is inconsistent with Nationwide's theory of the case.

In its final brief and final oral argument, Nationwide argues that, even if the positions it has taken in this action are erroneous, it is a stranger to the settlement that Cincinnati reached with Umberger, and that settlement is neither relevant to nor binding upon Nationwide.

### Summary of This Decision

In summary, the court has found that:

Partial summary judgment on liability, interlocutory in nature, which both insurers seek, is appropriate. The motions for partial summary judgment will be granted.

At all material times, Gearhart was using the Shipp pickup truck as a pickup truck, within the scope of Shipp's permission, and in the course of his duties as an F&S employee.

Nationwide had a duty to defend both Gearhart and F&S in the Umberger suit, and likewise had a duty to indemnify them up to the limits of the Shipp policy.

Nationwide misapprehends the scope of the duty to defend and the effect of the "omnibus clause" on its duties. Assuming that the definition of "auto accident" is relevant, the incident that caused Umberger's injuries was, under Virginia law, an "auto accident."

Nationwide and Cincinnati stipulated that settlement of the Umberger claim was a precondition to litigating coverage issues.

The settlement with Umberger forecloses further litigation about the amount of Umberger's damages or the liability of Gearhart and F&S.

Nationwide cannot approbate and reprobate.

The Shipp policy provides $200,000 in primary coverage. The Gearhart policy and the Cincinnati auto and CGL policies share *pro rata* the balance of the $375,000 Umberger settlement.

## I. *Duties under the Insurance Contracts*

### A. *Nationwide's Duty To Defend*

At an earlier stage of this case, I ruled from the bench that Nationwide was obligated under the Shipp policy to provide Gearhart a defense in the Umberger suit. Because my explanation of that decision was no model of clarity, I revisit it here. I said "Although I could be something approaching articulate if I wrote an opinion letter with careful citation of many authorities, I think I will forgo that opportunity and rule from the bench." Tr., Duty to Defend Hr'g, at 49.

When I found that Nationwide had a duty to defend Gearhart, I declined to rule on whether Nationwide also owed F&S a duty of defense, saying that I thought that further factual development might or might not be necessary. I said "And it seems to me that going from Mr. Gearhart to F&S is a matter in which I cannot say material facts are not in dispute. I am not sure they actually are in dispute but I am not — I am looking now for your stipulation. And I apologize for having things hither, thither, and yon." Tr., Duty to Defend Hr'g, at 60. "For today, at any rate, the Court is of the opinion that the question of the duty of defense to F&S requires evidentiary development and is not appropriate for summary judgment. And everyone's objection to that ruling is noted." *Id.*, at 65. I am now satisfied that the court needs no further evidence to decide whether Nationwide had a duty to defend F&S.

### B. *Breadth of the Duty To Defend*

"[A]n insurer's duty to defend . . . is broader than [the] obligation to pay and arises whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *AES Corp. v. Steadfast Ins. Co.*, 283 Va. 609, 617, 725 S.E.2d 532, 535 (2012) (quoting *Virginia Elec. & Power Co. v. Northbrook Prop. & Cas. Ins. Co.*, 252 Va. 265, 268-69, 475 S.E.2d 264, 265-66 (1996)). Courts look to the allegations in the plaintiff's complaint to determine whether an insurer is obligated to provide a defendant with coverage under its policy. *Travelers Indem. Co. v. Obenshain*, 219 Va. 44, 46, 245 S.E.2d 247, 249 (1978).

> If the allegations state a case which may be covered by the policy, [the company] has a duty to defend, and it may be liable also to pay any judgment rendered upon those allegations. On the other hand, if it appears clearly that [the company] would not be liable under its contract for any judgment based upon the allegations, it has no duty even to defend. These rules are established by our prior decisions.

*Id.* "[I]f it is doubtful whether the case alleged is covered by the policy, the refusal of the insurer is at its own risk." *London Guar. Co. v. White & Bros., Inc.*, 188 Va. 195, 199-200, 49 S.E.2d 254, 256 (1948).

Instead of recognizing that the duty to defend is broader than the duty to indemnify, Nationwide erroneously argues that these duties are coextensive. It urges the court to "jump over that threshold issue," the duty to defend, and to focus on "was this a loss arising out of an auto accident. If the answer is no to that, then we don't owe a defense." Tr., Duty to Defend Hr'g, at 9. "Push aside defense, because we owe no duty to defend if we owe no duty to indemnify." Tr., Summ. J. Hrg, at 53.

That is not the test. To determine whether there is a duty to defend, Virginia courts apply the "eight corners rule."

### C. *The Eight Corners Rule and the Omnibus Clause*

"[I]t is a well-established principle, consistently applied in this Commonwealth, that only the allegations in the complaint and the provisions of the insurance policy are to be considered in deciding whether there is a duty on the part of the insurer to defend and indemnify the insured." *AES*, 283 Va. at 616-17 (citations omitted). "This principle is commonly known as the eight corners rule because the determination is made by comparing the four corners of the underlying complaint with the four corners of the policy." *Id.*

Because of the Virginia Code's "omnibus clause," the four corners of the Shipp policy are broader than Nationwide acknowledges.

### D. *The Omnibus Clause Is Part of Nationwide's Policies*

By statute, every vehicular liability policy issued in Virginia is deemed to include an "omnibus clause." The omnibus clause is found in Virginia Code § 38.2-2204. Virginia Code § 38.2-2204 "is a remedial statute enacted to serve the public policy of broadening the coverage of automobile liability insurance for the protection of the injured persons." *GEICO v. USAA*, 281 Va. 647, 657-58, 708 S.E.2d 877, 883 (2011) (quoting *Liberty Mut. Ins. Co. v. Tiller*, 189 Va. 544, 548-49, 53 S.E.2d 814, 816 (1949)). In other words, Nationwide's policies contain more than the words printed on Nationwide's forms. "The statute is made a part of each policy. The coverage is not restricted to the named insured, but is expressly extended to embrace any person legally using or operating the [vehicle] with the permission, express or implied, of such owner." *Tiller*, 189 Va. at 548-49. It explicitly assures coverage for (i) any injury (ii) negligently caused (iii) by a person (iv) using the vehicle (v) with the owner's implied or express permission.

### E. *Applying the Eight Corners Rule*

Umberger's Complaint unmistakably asserts that Gearhart, while operating the pickup truck, negligently caused bodily injury. It says that Gearhart:

> operated a pickup truck laden with an unsecured 4-foot by 8-foot piece of plywood board in the rear bed of the pickup truck and positioned the pickup truck with its unsecured load in proximity to the pedestrian walkway. . . . [¶ 2];

> did so carelessly, recklessly, and negligently fail to secure or fasten the large 4-foot by 8-foot sheet of plywood, and/or negligently loaded it in such a way as to allow it to escape from the bed of the pick-up type motor vehicle, become airborne, and violently strike the Plaintiff about his head, neck, shoulders, and back. [¶ 4]; and,

> [a]s a proximate result of the negligence of the Defendant Jimmy C. Gearhart, Jr., [and the vicarious and concurrent negligence of others] the Plaintiff, David Kyle Umberger, III, was caused to sustain serious and permanent injuries. . . . [¶ 5].

These are (to paraphrase AES), allegations of facts and circumstances that, if proved, would fall within the risk covered by the Shipp policy as broadened by the omnibus clause. It is impossible to read them any other way. See AES, 283 Va. at 617. (There is, of course, no question that Gearhart was a permissive user of the vehicle.)

This court has found (as discussed below) that, when Gearhart and his supervisor placed the unsecured sheet of plywood in the pickup truck's bed, they were "using" the pickup truck within the meaning of the omnibus clause. And, they were doing so within the scope of the owner's permission.

### F. *Nationwide's Duty to Defend F&S*

For these reasons, Nationwide also was obligated, under the Shipp policy, to defend F&S. The pickup truck was the "covered auto" under the Shipp policy. Both Gearhart and F&S were "Insureds" under the Shipp liability coverage. The definition of "Insured" includes "[a]ny person using or responsible for the use of your covered auto." The pickup truck was the covered auto, and Gearhart was a person using or responsible for the use of that vehicle. For the covered auto, the definition of "Insured" includes "any person or organization but only with respect to legal responsibility for acts or omissions of a person for whom coverage is afforded under this Part." Umberger's Complaint explicitly alleges that Gearhart was "acting in the course and scope of his employment" for F&S. Compl. ¶ 2. His claims

against F&S are based on the doctrine of *respondeat superior*, that is, that the master is vicariously liable for the acts and omissions of the servant who acts within the scope of employment. *See Butler v. Southern States Coop., Inc.*, 270 Va. 459, 466, 620 S.E.2d 768, 773 (2005); *Sayles v. Piccadilly Cafeterias, Inc.*, 242 Va. 328, 332, 410 S.E.2d 632, 634 (1991). In other words, Umberger's pleading alleges that F&S is legally responsible for Gearhart's acts or omissions.

The factual allegations in Umberger's Complaint would, if proved, fall within the risk covered by the policy. *See AES*, 283 Va. at 617, and discussion above.As discussed below, this use of Shipp's pickup truck for F&S's business was within the scope of the owner's implied permission.

No provision of the Shipp policy excludes coverage of F&S under the circumstances of this case.

## G. *The Scope of the Implied Permission*

The "applicable rule of law," our Supreme Court has explained, is that "one with whom the named insured has left a vehicle for general use may permit its use by another, who will be deemed to have the permission of the named insured." *Virginia Farm Bureau Mut. Ins. Co. v. Appalachian Power Co.*, 228 Va. 72, 77, 321 S.E.2d 84, 87 (1984). Put differently:

> When a named insured [Shipp] entrusts a car to another [Gearhart] for his general use, the person so entrusted — *i.e.*, the first permittee — also may permit a third person to use the car — *i.e.*, the second permittee [F&S, by and through its employees and agents, Gearhart and Altizer]. In such instances, we have held that the second permittee has the implied permission of the named insured to use the vehicle.

*GEICO*, 281 Va. at 657.

In this case, the court need not speculate about the breadth of Gearhart's permission because, in a hearing in which Gearhart and Shipp participated, Cincinnati and Nationwide stipulated that:

> Ms. Shipp will testify that she placed no restrictions on his [Gearhart's] use of the truck at all. She will testify that she believes that the placement of the board in the truck was within the scope of the permission she granted.
>
> And Mr. Gearhart will also testify that he believes that the placement of the board in the bed of the truck was within the scope of the permission granted to him. . . .

> It is not as though either of these witnesses will testify that: I clearly contemplated that Jimmy would use this vehicle for work purposes. It simply never crossed either of their minds.
>
> The rest of that stipulation is that Ms. Shipp placed no restrictions on Mr. Gearhart's use of the vehicle.

Tr., Summ. J. Hr'g, at 13-16.

### H. *No Nationwide Policy Exclusions Apply*

Nationwide incorrectly asserts that coverage is excluded under Exclusion A.7 in the Shipp and Gearhart policies. *See* Nationwide's Reply Br. to Cincinnati's Mot. Summ. J., at 4, 6. While that paragraph explicitly says that Nationwide does not provide liability coverage for losses resulting from the use of an insured vehicle "while employed or otherwise engaged in any business (other than farming or ranching)," a subparagraph says (as Cincinnati noted) that that "Exclusion (A.7) does not apply to the maintenance or use of a . . . Pickup or van." In other words, the exclusion is inapposite by the terms of the Nationwide policy, and Nationwide should not have asserted that it was relevant.

Nationwide also points out that the Shipp and Gearhart policies exclude coverage "for any insured . . . [u]sing a vehicle without a reasonable belief that the insured is entitled to do so." The company's argument for invocation of this policy exclusion is, at best, far-fetched. The stipulated evidence admits of no conclusion except that Gearhart had and reasonably believed that he had Shipp's unrestricted permission to use the pickup truck in the manner he did. Nothing in the stipulated evidence, or in inferences fairly to be drawn from the stipulated evidence, suggests that there was any reason to believe that he was not entitled to use the truck as he did.

### I. *Nationwide's Duty To Indemnify*

The fact that an insurer has a duty to defend does not mean that it also has a duty to indemnify. *See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins.*, 566 F.3d 150, 155 (4th Cir. 2009) (citing *Brenner v. Lawyers Title Ins. Corp.*, 240 Va. 185, 397 S.E.2d 100 (1990)).

"In determining the scope of coverage provided under the Nationwide policy, we must consider the intention of the parties to the insurance contract as expressed in the policy terms, including those terms required by [the omnibus clause]." *Nationwide Mut. Ins. Co. v. Smelser*, 264 Va. 109, 114, 563 S.E.2d 760, 763 (2002).

*J. Umberger's Injuries Arose from "Use" of the Pickup Truck*

Under the omnibus clause, the key inquiry is whether Umberger's injuries resulted from the "use" of the pickup.

The word "use," in this sense, requires a "causal relationship" between Umberger's damages and injury, on the one hand, and on the other, the pickup truck's employment as a vehicle, for purposes for which pickup trucks are designed or equipped. *See Fireman's Fund Ins. Co. v. Sleigh*, 267 Va. 768, 772, 594 S.E.2d 604, 606 (2004); *Smelser*, 264 Va. at 114; *Randall v. Liberty Mut. Ins. Co.*, 255 Va. 62, 66, 496 S.E.2d 54, 55-56 (1998); *Lexie v. State Farm Mut. Auto. Ins. Co.*, 251 Va. 390, 396-97, 469 S.E.2d 61, 64 (1996).

This "use" inquiry necessarily turns on the unique facts of each case. *Slagle v. Hartford Ins. Co.*, 267 Va. 629, 638, 594 S.E.2d 582, 586 (2004). The Supreme Court has repeatedly and explicitly stated that there is no "set formula" to be applied by trial judges who make this inquiry. *Id.* Instead, the Court has outlined "some general guidelines," *id.*, which focus on "the manner in which the vehicle, whether moving or stationary, is being employed." *Smelser*, 264 Va. at 114. Here are some of those general guidelines. "Actual use of the vehicle as a vehicle is not restricted to its transportation function. Use of the vehicle need not be the direct, proximate cause of the injury. 'in the strict legal sense'." *Slagle v. Hartford Ins. Co.*, 267 Va. 629, 636, 594 S.E.2d 582, 586 (2004) (citations omitted). Nor is "occupancy or the immediate intent to occupy the . . . vehicle" a prerequisite to a finding that the vehicle is being used as a vehicle. *Id.* In *Slagle*, the Court found that a tractor-trailer was being "used" by a supervisor who was standing behind the rig, guiding its operator. A vehicle need not be in motion for it to be "used." *Great American Ins. Co. v. Cassell*, 239 Va. 421, 389 S.E.2d 476 (1990) (fireman standing 20-25 feet from his parked fire truck was "using" the truck).

Under the principle of *stare decisis*, the "well-settled approach" to determining whether a particular fact-pattern comes within the boundaries drawn by the Supreme Court is to examine the facts of the Court's relevant decisions. *See Baker v. Poolservice Co.*, 272 Va. 677, 688-89, 636 S.E.2d 360, 367 (2006); *Slagle*, 267 Va. at 634 (revisiting prior decisions gives "additional insight and guidance to the proper resolution of the issue presented").

While only decisions of Virginia's appellate courts and the United States Supreme Court bind this court, factually similar decisions of other courts may have persuasive authority. Before returning to discussion of Virginia cases, I discuss such a case.

## K. *The Appellate Decision Factually Closest to This Case*

Among reported American decisions, *Kern v. Auto Owners Ins. Co.*, 526 N.W.2d 409 (Minn. App. 1995), is the case whose facts most closely parallel those of this case. Minnesota, like Virginia, looks to whether the vehicle is being used "as a vehicle." *Id.* And, like Virginia, Minnesota requires a "causal connection" between the injury and the truck's use as a vehicle. *See Waseca Mut. Ins. Co. v. Noska*, 331 N.W.2d 917, 920 (Minn. 1983).

In *Kern*, Truman Beaulieu purchased insulated siding. He put it in the bed of his pickup truck without tying it down and then drove over a frontage road to a nearby grocery store. He parked the pickup in the store's lot and went into the store to shop. Janet Kern, walking to her truck, which was parked in the same lot, "was struck by some insulated siding that blew out of Beaulieu's nearby pickup truck." *Id.* at 410.

Kern brought suit to recover for her injuries. Under Minnesota's statute, the opinion says, Kern had to sue both Beaulieu's insurer and her own auto insurance company to receive no-fault benefits. *Id.* The Minnesota Court of Appeals affirmed the trial court's finding that her injuries arose out of the "maintenance or use of [Beaulieu's] motor vehicle as a vehicle." *Id.* at 411 (quoting Minn. Stat. § 65B.43, subd. 3 (1992)).

The pickup truck, the Court explained:

> was designed specifically to accommodate and transport materials such as the building materials involved. Put another way, the accident happened, not in a unique or bizarre way, but in a way utilizing the specific design and usage of a pickup truck. Beaulieu did not secure the materials sufficiently and the materials blew out the back of the truck. When a person transports materials in an open pickup truck without securing them properly, it follows naturally that materials may be blown off the bed and out the back. If the materials strike someone, the injury is a "natural and reasonable incident or consequence of the use of the vehicle."

*Id.* at 411 (citation omitted). "Pickups are designed, bought, and used to carry things in the back as well as passengers in the front. The transportation of items in the bed of a pickup is integral to the nature of a pickup." *Id.* at 412; *compare Kern*, 526 N.W.2d 409, *with Sleigh*, 267 Va. at 772. They proceed from the same or similar theoretical bases. *See also* Virginia Code § 46.2-100 (a pickup truck is "designed for the transportation of property"); Virginia Code § 46.2-1156.1 (pickup truck "bed" synonymous with "rear cargo area").

In *Kern*, the pickup truck had been driven a short distance with the unsecured building materials in its bed; Gearhart, on the other hand, had

not moved his pickup between the time he and Altizer loaded the plywood in its bed and the moment of injury. This, in the *Kern* Court's analysis, is no distinction.

That Court was emphatic that neither the fact that the building materials had been driven a short distance in the pickup truck nor the fact that the truck was parked was relevant to the decision that, when the truck's owner put building materials in the bed of his pickup, he was using it as a vehicle. *Id.* at 411-12; *see also North River Ins. Co. v. Dairyland Ins. Co.*, 346 N.W.2d 109, 110-13 (Minn. 1984) (since vehicle could not be operated without removing a tarpaulin, plaintiff was "using" vehicle as a vehicle when he was injured while attempting to remove the tarpaulin).

There are several other out-of-state cases worthy of note, which are discussed below. None is as close to being factually congruent with the case at bar as is *Kern*.

## L. *Instructive Virginia Cases*

*Fireman's Fund v. Sleigh*, 267 Va. 768, 594 S.E.2d 604 (2004), is distinctly on point. In that case, Betty Sleigh, an Alexandria Parking Enforcement officer, wrote a ticket, which she intended to place on Crystal Gibson's parked car. At that point:

> Gibson suddenly entered the vehicle, striking Sleigh with the car's door.Gibson called for someone to get her keys. From inside the car, she opened the door to get out and get her keys — again striking Sleigh with the door. As Gibson reentered the car, the officer "pushed the door back to defend myself." Gibson jumped out, again banging the door against Sleigh. With a final thrust of the car door, Gibson drove Sleigh into the side of her police vehicle, causing permanent back injury.

*Id.*, 267 Va. at 769-70.

Gibson was uninsured. Sleigh sought coverage under her own uninsured motorist (UM) policy, whose provisions covered "bodily injury . . . caused by accident and arising out of the ownership, maintenance, or use of [an] uninsured motor vehicle." *Id.* at 770-71. The UM carrier, in a declaratory judgment action, asserted that "use of the uninsured vehicle as a weapon is inconsistent with the concept of use of the vehicle as a vehicle" and that "the tortfeasor's intent was to use the car door to inflict injury, not for the ordinary purposes for which the door was designed, and that this is determinative." *Id.* at 771.

Both the trial judge and the Supreme Court of Virginia rejected the UM carrier's arguments. The Supreme Court focused on the car's doors, not the tortfeasor's intent, which, the Court held, was "irrelevant to the question of coverage." *Id.* Sleigh's injury, the Court found, "arose from the employment

of the vehicle in the manner for which it was designed and as reasonably contemplated by the parties to the insurance contract." *Id.* at 772.

> Car doors are designed and manufactured to be opened and closed. It is clearly within the contemplation of the parties to an insurance contract that injury may sometimes be caused by the act of using a car door as designed, either negligently or willfully. Here, Gibson's use of her car door as designed was use of the uninsured vehicle "as a vehicle" and was causally related to Sleigh's injury.

*Id.*

Nationwide mistakenly suggests that UM cases like *Sleigh* are irrelevant to this case. The Code of Virginia "is one act and is to be construed as a whole." *Good v. Commonwealth,* 155 Va. 996, 1000, 154 S.E. 477, 478 (1930). Multiple statutes must "be read and construed together in order to give full meaning, force, and effect to each. Moreover . . . courts read related statutes *in pari materia* in order to give, when possible, consistent meaning to the language used by the General Assembly." *Washington v. Commonwealth,* 272 Va. 449, 455, 634 S.E.2d 310, 314 (2006).

Statutes *in pari materia* have the same general or common purpose, are parts of the same general plan, or "relate to the same person or thing, the same class of persons or things or to the same subject or to closely connected subjects or objects." *Lucy v. County of Albemarle,* 258 Va. 118, 129, 516 S.E.2d 480, 485 (1999). Statutes, like those discussed here, whose purpose is to provide for the protection and compensation of innocent parties injured in motor vehicle accidents are statutes *in pari materia. See USAA Cas. Ins. Co. v. Hertz Corp.,* 265 Va. 450, 457, 578 S.E.2d 775, 778-79 (2003).

The Court in *Sleigh* relied in part on *Smelser,* 264 Va. 109. *Sleigh,* 267 Va. at 772. In *Smelser,* a purse-snatcher in a moving car grabbed a woman's handbag, dragging her beside the car. Her injuries, the Court explained, were causally related to the employment of the uninsured vehicle as a vehicle, because the force from the vehicle's movement directly contributed to her injuries and was used to remove the assailants from the scene of the crime. *Smelser,* 264 Va. at 115.

In *State Farm Mut. Auto Ins. Co. v. Rice,* 239 Va. 646, 391 S.E.2d 71 (1990), two men traveled to a hunting site in a Jeep. While the driver was standing outside the vehicle, his passenger got a rifle out of its case and loaded it. As he was removing the rifle from the vehicle, it discharged; the bullet hit and injured the driver. *Id.,* 239 Va. at 648.

The Supreme Court found that "the accident arose out of the use of the Jeep," *id.* at 649, and that "the requisite causal relationship between the accident and employment of the Jeep as a vehicle for imposition of coverage

on the automobile carrier exists." *Id.* at 650. A "sufficient nexus existed between [the passenger] and the Jeep itself, which had transported the men and their equipment to the hunting site. [The driver] had not completed his use of the Jeep when the rifle discharged." *Id.* at 650.

An insurer has no duty to indemnify when a vehicle is not used for its intended purposes, but (for example) as a platform from which weapons are fired or as a shield for drive-by shooters. *Compare Lexie*, 251 Va. 390, 469 S.E.2d 61, 64 (1996), *with Kemp v. Feltz*, 497 N.W.2d 751, 753-55 (Wis. App. 1993) (Illegal use of pickup truck as a "mobile hunting vehicle" for chasing and shooting at deer was consistent with truck's inherent use. Carrier had duty to defend and indemnify when the truck's occupants wounded a deer hunter.); *and with Erie Ins. Co. Exch. v. Jones*, 248 Va. 437, 442, 448 S.E.2d 655, 658 (1994) (manslaughter; "the proximate cause of the wrongful death was a criminal assault, one related to the use of an uninsured motor vehicle only by a chronological sequence of events").

Nationwide argues that, because Gearhart's truck was parked, it was not being used as a vehicle, but simply as a storage container. In this argument, counsel for Nationwide inadvertently went beyond the facts that are stipulated or admitted. I consider and discuss only facts that are properly before the court. This is not a case in which, *e.g.*, the vehicle "merely was the situs for a social gathering." *See State Farm Mut. Auto Ins. v. Powell*, 227 Va. 492, 318 S.E.2d 393, 398 (1984). Nor is it a case in which, *e.g.*, a van had been parked, padlocked, used "solely as a storage compartment or tool shed" for at least a month. *See State Farm Mut. Auto. Ins. Co. v. Virginia Farm Bur. Mut. Ins. Co.*, 462 F. App'x 414, 417 (4th Cir. 2012) (unpublished). (When counsel referred to this case in oral arguments in this case, the Fourth Circuit had not yet rendered its decision. Counsel referred to the District Court's judgment, which the Court of Appeals reversed.)

## M. *Other Persuasive Cases*

In a New Jersey case, the facts were "relatively simple":

> Plaintiff Richard Diehl was driving away from his home when he noticed his brother George Diehl approaching in a pickup truck. Richard pulled over to the side of the road. He got out of his vehicle, walked around the rear of the truck, and was bitten in the face by George's dog, which was in the open cargo area of the pickup truck.

*Diehl v. Cumberland Mut. Fire Ins. Co.*, 686 A.2d 785, 786 (N.J. Super. Ct. App. Div. 1997), *cert. denied*, 693 A.2d 112 (N.J. 1997). The trial court held that the injury did not arise out of the use of a vehicle as a vehicle. The appellate court reversed, saying that automobile liability insurance should cover this injury not only "because it arose out of the use of the vehicle to

transport the dog," but that, "[m]oreover, the bite incident was facilitated by the height and open design of the deck." *Id.* at 788.

Similarly, in *Farmers Ins. Co. of Arizona v. Till*, 825 P.2d 954 (Ariz. App. 1991), the driver of a "pickup/camper" moved her dog from the vehicle's passenger cabin to the camper bed, but failed to close the sliding glass window that separated the cabin and the camper section. The dog pushed its way through the window and bit a passenger. The Court held that the vehicle was not simply the site of the injury. Rather, the driver's use of the "inherent design of the pickup/camper" to attempt to separate her passenger from her "potentially dangerous cargo" "demonstrate[d] the necessary causal link between the truck and the accident" and that the matter arose from the "use" of the pickup/camper as such. *Id.; accord, Transamerica v. Farmers Ins. Exch.*, 463 N.W.2d 641 (N.D. 1990).

*Transamerica* also involved a pickup and a dog bite. In that case, when the truck's owner "stopped for refreshments at the Esquire Club in Dickinson and parked his pickup on the street nearby," he left his dog, Sam, "in the open pickup box, telling him to stay. While Sam waited in the pickup box, he bit a pedestrian in the face when she paused on the adjacent sidewalk." *Transamerica*, 463 N.W.2d at 642.

The vehicle's insurer argued "that the insured's potential liability did not arise out of ownership, maintenance, or use of the pickup . . . because the pickup was merely the situs of the incident." *Id.* The North Dakota Supreme Court disagreed: "The stationary position of the vehicle or the physical function of motion, *i.e.*, operation, is not the issue. The functional word here is the word use." *Id.* at 643.

"The dog, Sam," the Court said, "would not have been close enough to the public sidewalk to bite a pedestrian in the face without use of the pickup to haul the dog and to hold the dog while waiting. We agree with the trial court's finding that a causal connection is present here." *Id.; see also Tasker v. Larson*, 439 N.W.2d 159, 159-60 (Wis. App. 1989) (leaving children in pickup truck while "briefly attending to a minnow trap in a nearby stream" was reasonably consistent with the inherent nature of the vehicle. *Id.* at 159-60); *Howard v. Ponthieux*, 326 So. 2d 911 (La. App. 1976) (tow truck driver was "using" the pickup truck that he was towing when the pickup broke loose).

Nationwide cites another dog-bite case, *State Farm Mut. Ins. Co. v. Peck*, 900 S.W.2d 910 (Tex. App. 1995). In *Peck*, the plaintiff and the defendant's dog were passengers in the back seat of the defendant's car, traveling from the veterinarian to the dog groomer, when the dog bit the plaintiff. *Id.* at 912. This incident, the Texas court held, was not an "auto accident." It is difficult to quarrel with that decision. The facts of that case, however, appear to be inapposite to the facts of the case before this court.

### N. *Another Relevant Factor Emerges from Case Law*

This case and several of those discussed above have another common factor. Gearhart and Altizer, it will be remembered, were in the process of coming back to the pickup truck and plywood sheet when Umberger was injured. They "had not completed [their] use of the [truck]." *State Farm v. Rice*, 239 Va. at 650. The same is true of drivers in other cases discussed above, *e.g.*, shopping in a grocery store, *Kern*, 526 N.W.2d 409; drinking in a social club, *Transamerica*, 463 N.W.2d 641; socializing with a brother, *Diehl*, 686 A.2d 785; and attending to a minnow trap, *Tasker*, 439 N.W.2d 139.

### O. *Virginia Precedent Supports Finding of "Auto Accident"*

The alpha and omega of Nationwide's argument is its insistence that it owes no duty of coverage because Umberger's injuries were not caused by an "auto accident."

As demonstrated above, this argument is effectively mooted by the omnibus clause and its statutory incorporation into Nationwide's policies, coupled with the "use" of Shipp's pickup truck as a pickup truck.

To the extent that the definition of "auto accident" may remain an issue in this case, there is relevant Virginia case law that neither Nationwide nor Cincinnati discusses. Nationwide relies on a treatise and on cases from other jurisdictions. Cincinnati conflates the discussion of "auto accident" with the discussion of "use" of the vehicle. It appears to the court, for these reasons, that the incident in which Umberger was injured was an "auto accident" under Virginia law.

Virginia's appellate courts have rejected the contention that the term "auto accident" is, as Nationwide argues, limited to collisions and near-collisions. Terms like "auto accident," "car accident," and "automobile accident" have long been in the vernacular, with a broad common-sense meaning. From 1935 or earlier through 2012, the Supreme Court of Virginia's definition of "accident" has been clear and consistent. The incident in which Umberger was injured comes within that definition. An accident in the course of the use of an auto must perforce be an "auto accident." No one has suggested that there is any question about whether the Shipp pickup truck fulfills the "auto" requirement of an "auto accident." It is, by definition, the "covered auto" in the policy that Nationwide issued to Shipp.

### P. *"Auto[mobile] Accident" Is Not Synonymous with "Collision"*

Walking a fine line, Nationwide states that "[i]t does not appear as though any Virginia court has construed the meaning of "an auto accident" *within the context of a personal automobile insurance policy*." Nationwide Opening Br. Supp. Mot. Summ. J., at 4 (emphasis added). That statement is correct, as far as it goes.

Proceeding as if it were writing on a clean slate, Nationwide contends that an "auto accident" occurs only when "vehicles are involved in some type of collision or near collision. *Id.* at 40 (citing *Couch on Insurance*, § 119.5, n. 220 (2007)). That position has been flatly rejected by the Court of Appeals of Virginia.

"Clearly, there is nothing inherent in the meaning of the word [accident] that suggests that it applies only when a vehicle strikes or collides with a person or property." *Smith v. Commonwealth*, 8 Va. App. 109, 114, 379 S.E.2d 374, 377 (1989) (prosecution for failure to stop at scene of accident) (Keenan, J.). In the vehicular context, as in others, the term "accident" means "an event occurring by chance or from unknown causes" or "an unfortunate event." *Id.; accord Leveroni v. Arlington County*, 18 Va. App. 626, 627, 445 S.E.2d 723, 724 (1994) (whether warrantless arrest was made "at the scene of any accident involving a motor vehicle." *Id.* at 626).

Contrary to Nationwide's suggestions, there is ample reason to believe that, in the jurisprudence of this Commonwealth, the term "auto accident" and like terms apply to any "unfortunate vehicular event." *See Milazzo v. Commonwealth*, 276 Va. 734, 738, 668 S.E.2d 158, 160 (2008).

The Supreme Court's opinion in *Milazzo* noted approvingly that the Court of Appeals had quoted and cited Judge Keenan's *Smith* opinion — "the word 'accident' is defined, in part, as 'an unfortunate event' " — in denying Milazzo's petition for appeal. *Milazzo*, 276 Va. at 737. Writing for the Supreme Court, Justice Stephenson, a careful wordsmith, transformed "unfortunate event" into "unfortunate vehicular event."

In *Milazzo*, unlike *Smith*, there was a collision. The defendant sought to avoid responsibility for leaving the scene of an accident by arguing that, since his actions were intentional, there was no "accident." Rejecting that argument, the Supreme Court focused, as it does in all automobile accident cases, on the statutory purpose of protecting innocent persons. *Id.* at 737 (citing *State v. Smyth*, 397 A.2d 497, 498-99 (R.I. 1979)).

### Q. *"Auto Accident" Is a Term with an Established Practical Everyday Meaning*

Terms like "auto accident," "automobile accident," and "car accident" have long been part of the vernacular. More than sixty years ago, the Supreme Court of Virginia explained that "in its practical, everyday use, in this day when injuries by motor vehicles are of hourly occurrence, accident is commonly used to describe any injury which happens without design." *Tri-State Coach Corp. v. Stidham*, 191 Va. 790, 799, 62 S.E.2d 894, 898 (1951); *cf. Combs v. Hunt*, 140 Va. 627, 634, 125 S.E. 661, 663 (1924) ("The use of the automobile has become universal in this country, and automobile accidents occur so frequently that they may be said, like the poor, to be always with us."); *McBride v. First Nat'l Bank*, 170 Va. 282, 283, 196 S.E. 589, 589 (1938) ("This is another of the numerous automobile accident cases

that find their way to this court."). *See also Ocean Accident & Guarantee Corp. v. Glover*, 165 Va. 283, 285, 182 S.E. 221, 222 (1935). In 1951, the Court perceived that "technically" the word "accident" could be construed "in its strictly proper use" to exclude negligence. *Tri-State Coach*, 191 Va. at 799. In 2012, the Court held that "[a]ccident and negligence are not mutually exclusive in most instances." *AES*, 283 Va. at 620.

### R. *The Term "Accident" Is Well-Understood in Virginia Law*

In *Glover*, the Court examined the meaning of the word "accident" in the context of an insurance policy that provided benefits only if disability or loss resulted from "accidental means." *Id.* at 284. The Court adopted a dictionary definition: "Accident: n. An event that takes place without one's foresight or expectation; an undesigned, sudden, and unexpected event; chance; contingency, often; an undesigned and unforeseen occurrence of an afflicted or unfortunate character; casualty, mishap; as, to die by accident." *Id.* at 285 (quoting *Webster's New International Dictionary* (1st ed. 1933)); *accord, Smith v. Combined Ins. Co.*, 202 Va. 758, 760-61, 120 S.E.2d 267, 268 (1961).

Chief Justice Campbell, writing for the Court in *Glover*, quoted from several other cases that used similar definitions of "accident." Among them was an opinion of the United States Supreme Court, *United States Mut. Accident Ass'n v. Barry*, 131 U.S. 100, 121 (1889) ("if in the act which precedes the injury something unforeseen, unexpected, unusual occurs which produces the injury, then the injury has resulted through accidental means"). *Glover*, 165 Va. at 285-86.

The *Glover* opinion also quoted a decision of the Court of Appeals of New York, saying that the "opinion, delivered by Mr. Justice Cardozo, is so concise and, in our view, so conclusive of the point in issue that we feel justified in quoting it at length." *Id.* at 286. Justice Cardozo wrote, *inter alia*:

> Probably it is true to say that in the strictest sense, and dealing with the region of physical nature, there is no such thing as an accident. . . . But our point of view in fixing the meaning of this contract must not be that of a scientist. It must be that of the average man. Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident. This test — the one that is applied in the common speech of men — is also the test to be applied by courts.

*Id.* (quoting *Lewis, Ex'x v. Ocean Accident & Guar. Corp.*, 120 N.E. 56 (N.Y. 1918) (citations omitted)).

Similarly, in 2012, the Supreme Court of Virginia said that "[w]e have held that an 'accident' is commonly understood to mean an event which creates an effect which is not the natural or probable consequence of the means employed and is not intended, designed, or reasonably anticipated. An accidental injury is one that 'happen[s] by chance, or unexpectedly; taking place not according to the usual course of things; casual; fortuitous." *AES*, 283 Va. at 617-18 (alteration in original) (citations and quotation marks omitted).

(I note, in passing, that the original Joint Stipulation of Facts entered into by Nationwide and Cincinnati stated that Umberger's bodily injuries were sustained "during an accident [¶ 7]." The word "accident" does not appear in the amended stipulation.)

## II. *Nationwide Cannot Approbate and Reprobate*

Nationwide, which commenced this litigation and has vigorously pursued adjudication of its rights, seems to have reversed field. Audaciously, in its final brief and oral argument, Nationwide apparently says that any adverse ruling will not affect it, though Cincinnati would be bound by a ruling in Nationwide's favor.

Specifically, Nationwide says that the amount that Cincinnati paid to Umberger to settle the tort claim is irrelevant,[2] and that, notwithstanding its pleadings and stipulations, Nationwide has no obligation to pay until a jury has determined liability and damages. Counsel for Nationwide said this in the final argument on the subject: "I do want to point out, Judge, that as it states in the stipulation that Counsel just read prior to mediation, Cincinnati and Nationwide agreed to reserve all rights under the Cincinnati and Nationwide policies and applicable law. So the idea that somehow Nationwide has waived its right to demand that the issues of liability and damages be tried by jury, I think is wrong. I do not think the stipulation says that." Tr., Summ. J. Hr'g, at 81.

Nationwide is wrong on both counts. And it is attempting to take unfair advantage of a situation of its own making.

In Virginia, "[a] party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory. Nor may a party invite error and then attempt to take advantage of the situation created by his own wrong." *Rowe v. Commonwealth*, 277 Va. 495, 502, 675 S.E.2d 161, 163 (2009) (quoting *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 181, 623 S.E.2d

---

2. "The dollar amount of the settlement of the underlying *Umberger v. Gearhart* civil action," Nationwide asserts, "is irrelevant to the issues outstanding before this Court because the terms of that settlement are not binding upon Nationwide." Reply Brief of Nationwide to Cincinnati's Mot. Summ. J., at 5. "Absent an admission of liability by Nationwide (and there was no such admission) the settling party's liability must be re-litigated to determine what, if any, liability Nationwide must accept." *Id.*

889, 895 (2006)). A party "will not be permitted to change his position to the prejudice of his adversaries in contravention of [a] stipulation freely entered into." *McLaughlin v. Gholson*, 210 Va. 498, 501, 171 S.E.2d 816, 817·(1970). A party cannot complain about what it receives, when what it gets is something for which it asked. *Mann v. Commonwealth*, 13 Va. App. 677, 679-80, 414 S.E.2d 613, 615 (1992) (quoting *Clark v. Commonwealth*, 220 Va. 201, 214, 257 S.E.2d 784, 792 (1979), *cert. denied*, 444 U.S. 1049 (1980)).

Approbating and reprobating is precisely what Nationwide is doing.

## A. *Reading the Stipulation between Cincinnati and Nationwide*

Nationwide's arguments about the effect of its stipulation with Cincinnati prompt the thought that, on occasion, lawyers and judges must apply "not [just] arcane or complex legal directives, but ordinary common sense." *See Yarborough v. Alvarado*, 541 U.S. 652, 670 (2004). Courts do not make rulings that "would defy common sense." *See Mathews v. PHH Mortg. Corp.*, 283 Va. 723, 732, 724 S.E.2d 196, 200 (2012).

During a hearing in this case, I referred to a phrase used by Justice Albertis S. Harrison, Jr., writing for the Supreme Court of Virginia in a criminal case. Nationwide's argument causes me to return to that case, *Johnson v. Commonwealth*, 221 Va. 736, 273 S.E.2d 784, *cert. denied*, 454 U.S. 920 (1981).

The defendant in that case was convicted of a type of capital murder: willful, deliberate, and premeditated murder in the commission of robbery while armed with a deadly weapon. He had a logical and lawyerly explanation of the reason that his conviction could not stand. Robbery is an essential element of the offense with which he was charged. In a previous trial, a jury had found him not guilty of the robbery. The Double Jeopardy Clause bars the state from introducing evidence to prove an offense of which a defendant has been previously acquitted. *Ergo*, the conviction must be vacated and the case remanded for new trial on a charge no higher than first-degree murder.

There was, however, an additional fact that made his argument one that only a lawyer could love. The jurors in the previous trial had been instructed that, if they found the defendant guilty of capital murder, they must find him not guilty of robbery, and they had, in fact, found him guilty of capital murder. That conviction was reversed for other reasons, and the case was before the Supreme Court after a second conviction.

Here is what Justice Harrison said: "This court would stultify itself to hold that the jury in this case made a factual finding that Johnson was innocent of robbery." *Johnson*, 221 Va. at 741. To stultify is "to cause to appear or be stupid, foolish, or absurdly illogical; to allege or prove oneself or another to be of unsound mind." *Webster's New International Dictionary* 2269 (3d ed. 1986).

In my considered judgment, this court would stultify itself, if it were to accept Nationwide's position about the meaning of this stipulation:

> Prior to the mediation, Cincinnati and Nationwide agreed to reserve all rights under the subject Cincinnati and Nationwide policies and applicable law and agreed that Nationwide's and/or Cincinnati's participation in the mediation, including potential settlement of the plaintiff's claims, would not constitute a waiver of any rights, duties, or claims between Nationwide and Cincinnati in this insurance coverage action. Specifically, Cincinnati and Nationwide agreed to litigate the insurance coverage issues this case presents following settlement of the Underlying Tort Action.

The first thing to remark upon is that Nationwide and Cincinnati agreed that *settlement* of the Umberger suit was a precondition to litigating the coverage issues — "settlement," not "resolution," nor "conclusion," nor "final verdict." Nationwide and Cincinnati had "an accord, a meeting of the minds" that the Umberger claim would be settled before coverage questions were addressed. *See Bangor-Punta Operations, Inc. v. Atlantic Leasing, Ltd.*, 215 Va. 180, 184, 207 S.E.2d 858, 860 (1974).

"Settlement" is not an obscure term. Settlement of a lawsuit or other disputed claim connotes a compromise resolution. *See, e.g.*, Va. Code §§ 8.01-424 and 8.01-424.1 (interchangeable use of words "settlement" and "compromise"). The settlement of a claim for personal injuries, such as Umberger's claim, involves the payment of money (in a lump sum or through a structure) and a release of claims. *See generally* 5B Am. Jur. 2d, *Compromise and Settlement*, § 1; 4A M.J., *Compromise and Settlement*, §§ 5-6. That is what happened in this case. In exchange for payment of $375,000, Umberger released his claims against Gearhart, F&S, and others.

The underlying purpose of a compromise or settlement is, self-evidently, "to end a claim or dispute and avoid, forestall, or terminate litigation." *Vance v. Lozano*, 981 N.E.2d 554, 558 (Ind. App. 2012) (citations omitted). When a case has been settled, there are no questions about the amount of damages or their causation or about who might be liable to whom. There are no appeals. *See Mansfield v. Bernabei*, 284 Va. 116, 124, 727 S.E.2d 69, 74 (2012) ("The importance of encouraging compromise and settlement is unquestioned in our jurisprudence."). Nationwide would turn that concept on its head.

Juries are empaneled by courts to decide actual cases and controversies. *See, e.g., E.C. v. Virginia Dep't of Juvenile Justice*, 283 Va. 522, 530, 722 S.E.2d 827, 831 (2012). Umberger's settlement with Cincinnati mooted any actual controversy between him and those he had claimed were responsible for his injuries. *Id.* There is no adverse party with whom Nationwide could

litigate liability and damages. The argument that the company is entitled to have a jury determine those questions is specious.

The operative language, that participation in mediation, potentially including settlement of Umberger's claims, "would not constitute a waiver of any rights, duties, or claims between Nationwide and Cincinnati in this insurance coverage action," cannot be read to encompass the right to have one's cake and eat it too, nor to create spurious rights.

Similarly, reservation of "all rights under the subject policies and applicable law" does not reserve the nonexistent right to relitigate matters that have been compromised.

Both Nationwide and Cincinnati changed their positions in reliance on the stipulation that settlement would precede litigation over the coverage questions; each concomitantly gave up the right to litigate liability and damages in the Umberger case.

The stipulation that the case had to be settled before coverage issues were litigated necessarily implied that the settlement amount is the fund to be allocated.

If the stipulation between Nationwide and Cincinnati is as illusory as Nationwide now represents it to be, it would be difficult to say that a justiciable controversy, the prerequisite for a declaratory judgment suit, existed. *See Daniels v. Mobley*, 285 Va. 403 (2013). Nationwide, which initiated this suit, is estopped to deny that there was a legitimate basis in law and fact for the suit it filed.

### B. *Nationwide's "Timely Notice" Argument*

Nationwide also contends that it can escape its policy obligations because it was not given timely notice of the incident giving rise to the claim. It had the right to present evidence on the point, by including relevant facts in a stipulation or otherwise, but did not do so. There are no facts from which the court could determine that notice was untimely. No facts have been presented or stipulated that would suggest that any delay in notification would have been material. *See* Va. Code § 38.2-2204; *Dairyland Ins. Co. v. Hughes*, 317 F. Supp. 928 (W.D. Va. 1970) (Widener, J.); *State Farm Mut. Auto. Ins. Co. v. Porter*, 221 Va. 592, 597, 272 S.E.2d 196, 198-99 (1980).

(Nationwide, which commenced this declaratory judgment action and answered the counterclaim with a general denial, also argues on brief the relevancy of a policy provision that Nationwide asserts precludes it from being sued without its permission. The court will treat this argument as withdrawn.)

### C. *Nationwide's Pleadings*

In its complaint commencing this declaratory judgment action, Nationwide said (among other things):

29. The Plaintiff Nationwide seeks a binding adjudication of its obligations with respect to liability coverage and its responsibility to indemnify and, or, defend the Defendant Gearhart in the civil action filed in the Circuit Court for the City of Roanoke, Virginia, and styled *David Kyle Umberger, III v. Jimmy C. Gearhart, Jr., et al.*, Case Number CL 07-1282, and, or, for any claims or causes of action arising, either directly or indirectly, out of the incident described therein.

30. This Court has jurisdiction to issue declaratory judgment as to the rights and obligations of the parties hereto pursuant to Section 8.01-184 *et seq.* of the Code of Virginia, 1950 as amended.

The complaint has not been amended. And "unless amended, a litigant's pleadings are binding upon him."

His opponent is entitled to rely upon the position he takes, and should be able to prepare for trial with the assurance that this position will not be suddenly changed without notice. For this reason, a litigant will not be permitted to assume, successively, inconsistent and mutually contradictory positions. *Winslow v. Scaife*, 224 Va. 647, 299 S.E.2d 354 (1983).

*Berry v. Klinger*, 225 Va. 201, 207, 300 S.E.2d 792, 795 (1983). This is sometimes called a type of judicial estoppel. *See Winslow*, 224 Va. at 653; *Burch v. Grace St. Bldg. Corp.*, 168 Va. 329, 340, 191 S.E. 672, 677 (1937).

Nationwide's Complaint for Declaratory Judgment sought complete relief, a "binding adjudication." The company cannot now take an inconsistent position. Nor is the carriers' stipulation as elastic as Nationwide would now read it.

Nationwide has waived and is judicially estopped from taking this position. *See Berry v. Klinger*, 225 Va. at 207.

D. *Cincinnati's Response*

Cincinnati's responses to Nationwide's changed position also are cogent, and the court accepts them and incorporates them by this reference.

III. *Allocation among Policies*

Cincinnati offered its views about the allocation of the funds among the Nationwide and the Cincinnati policies. As noted, Nationwide chose not to express any views on this subject, explaining that participation in such a discussion would be inconsistent with its position in this suit.

To determine the priority of coverage, a court looks to the language of the policies, including the "excess" and "other insurance" clauses. *See GEICO v. Universal Underwriters Ins. Co.*, 232 Va. 326, 331, 350 S.E.2d 612, 615-16 (1986); *State Farm Mut. Auto. Ins. Co. v. United Servs. Auto. Ass'n*, 211 Va. 133, 138, 176 S.E.2d 327, 331 (1970) ("excess coverage clause merely provides orderly process for determining the distribution of liability among several insurance carriers") (UM case).

The Nationwide Shipp policy is the only policy that provides primary insurance coverage for the claims that Umberger made against Gearhart and F&S. That policy, by its terms, is "excess" only with respect to a vehicle not owned by the named insured. Since Shipp, the named insured, did own the vehicle, her policy's "excess" provision does not apply. Hers is the only policy to which the "excess" provision does not apply.

The Gearhart policy provides that "any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance." The Cincinnati Business Auto Policy also states that it is "excess" with respect to a vehicle not owned by the named insured. The Cincinnati Commercial Package Policy likewise contains a provision that it is "excess" in the case of a non-owned vehicle not already covered by an exclusion. And the Cincinnati umbrella policy is of course "excess" over all other insurance. Cincinnati asserts that no coverage is afforded to Gearhart under its commercial general liability ("CGL") policy because that policy contains an "aircraft, auto, or watercraft exclusion." That exclusion bars coverage for bodily injury arising out of the ownership, maintenance, or use of an auto operated by, or loaned to, any "insured."

The court finds that Gearhart was not an "insured" under this policy, and that, therefore, this exclusion is inapposite. Under this policy, no employee is an "insured" for bodily injury "(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury. . . ."

It is at best difficult to discern the intention of those who drafted the words "for which there is an obligation to share damages with." One might possibly read the entire exclusion as referring to third-party claims or claims for contribution or indemnification. One might also read "for which there is any obligation to share damages with" independently of the rest of the sentence. One might read the language as referring to joint tortfeasors. It might not be a stretch to read this language as applying to cases in which a workers' compensation lien has been filed.

No reported cases construe this language. It is, however, clear that Umberger's claim was against Gearhart and F&S, and that, if the claim had been reduced to judgment, Gearhart would have had "an obligation to share damages" with F&S. "Doubtful, ambiguous language in an insurance policy will be given an interpretation which grants coverage, rather than one which withholds it." *S.F. v. West American Ins. Co.*, 250 Va. 461, 464,

463 S.E.2d 450, 452 (1995). (Although counsel have not discussed this point, there is no suggestion that F&S is excluded from coverage under the Cincinnati policies.)

Beyond the Shipp policy, which is "primary," the remaining policies provide excess coverage on a *pro rata* basis.

From the primary coverage, the Shipp policy, $100,000 is allocable to F&S, and $100,000 is allocable to Gearhart. This leaves $175,000 (exclusive of costs and interest) to be repaid to Cincinnati.

The total available for the excess coverage is $4,100,000:

$3 million – Cincinnati GCL – 73.17%;
$1 million – Cincinnati auto – 24.39%;
$100,000 – Nationwide Gearhart – 2.44%;
Cincinnati's umbrella policy is of course not reached.

Hence, Nationwide's share of the $375,000 settlement (exclusive of costs and interest) is $204,270.

Cincinnati has claims for reimbursement of the costs of defending F&S. There are no stipulations about those costs or their reasonableness. Unless the parties enter into agreements, those questions will be determined at trial. The court will hear and consider arguments concerning costs and interest.